# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CANAVERAL PORT AUTHORITY,**
**ET AL.**

    **Plaintiffs,**

**-vs-**                Case No. 6:09-cv-1447-Orl-28DAB

**M/V LIQUID VEGAS, IMO NO. 8222941,**

    **Defendant.**

_____

## ORDER

This cause came on for consideration with oral argument[1] on the following motions filed herein:

| | |
|---|---|
| **MOTION:** | **NEPTUNE RACE AND SPORTS BOOK, INC.'S MOTION FOR RELEASE OF PROPERTY INCIDENTALLY IN CUSTODY (Doc. No. 62)** |
| **FILED:** | October 7, 2009 |
| **THEREON** it is **ORDERED** that the motion is **DENIED in part and reserved in part**. | |
| **MOTION:** | **MODERN GAMING, INC.'S MOTION FOR RELEASE OF PROPERTY INCIDENTALLY IN CUSTODY (Doc. No. 63)** |
| **FILED:** | October 7, 2009 |
| **THEREON** it is **ORDERED** that the motion is **DENIED**. | |

---

[1] Oral argument was heard on October 15, 2009.

| | |
|---|---|
| **MOTION:** | **NORTH FLORIDA SHIPYARDS' MOTION TO SELL SLOT MACHINES APPURTENANT TO THE VESSEL (Doc. No. 65)** |
| **FILED:** | October 7, 2009 |

**THEREON** it is **ORDERED** that the motion is **GRANTED**.

| | |
|---|---|
| **MOTION:** | **CANAVERAL PORT AUTHORITY'S MOTION TO SELL AND JOINDER IN DOC. NO. 65 (Doc. No. 75)** |
| **FILED:** | October 13, 2009 |

**THEREON** it is **ORDERED** that the motion is **GRANTED**.

On August 21, 2009, Plaintiff Canaveral Port Authority filed a Verified Complaint to foreclose on its maritime lien for providing maritime necessaries to the vessel M/V Liquid Vegas (the "Vessel"). Doc. No.1. On September 8, 2009, the Vessel was arrested by the U.S. Marshal. Numerous other parties have intervened as Plaintiffs: North Florida Shipyards; Sysco Food Services; VNS International, Inc.; Johnny E. Ramos, Eric David Keekam, Carlos F. Melchor, Francisco Llopiz, David A Cabanzo, Sergejus Petrovas, Ioannis Loissios, Lazaro O. Dominguez, Juan Ramon Turcios, Carlos Cortes (collectively "the Crewmembers"); Neptune Race and Sports Book, Inc.; Modern Gaming, Inc.; Worldwide Diesel Power, Inc.; Imperial Premium Finance, Inc.; International Towing & Salvage, Inc.; Patricia K. Olney, P.A.; Capt. Kelly Pulsifer & Associates, Inc. *See* Doc. No. 16, 22, 28, 34, 36, 44, 55, 67, 69, 86.

On or about March 24, 2009, prior to the arrest of this Vessel, the owner filed a voluntary Chapter 11 bankruptcy petition in the Middle District of Florida, Orlando Division identified as *In re: Las Vegas Casino Lines, LLC*, Case No. 09-3690-ABB. On August 17, 2009, the Bankruptcy Court (Judge Briskman) entered an Order granting the Motion for Relief from the automatic stay and

permitting Canaveral Port Authority to file an admiralty action in this Court and arrest the Liquid Vegas as follows: "The automatic stay is modified to permit the Port to file a Complaint in the United States District Court (the "District Court") for foreclosure of its United States maritime lien, including the arrest of the ship Liquid Vegas owned by the Debtor, to permit all other parties with such maritime liens to foreclose their maritime liens, and to allow sale of the vessel in the District Court and distribution of the proceeds of the sale of the vessel to satisfy maritime liens." Doc. No. 4-2.

Following a September 25, 2009 status conference, The Court recommended to the presiding District Judge that the Plaintiffs' Motion for Interlocutory Sale of the Vessel be granted; Judge Antoon subsequently adopted the recommendation and ordered interlocutory sale of the Vessel set for October 29, 2009[2]. Doc. No. 80. This Court also ordered on October 1, 2009 that all motions to resolve the issue of ownership of property aboard the vessel be filed by noon on October 7, 2009. Doc. No. 54. On October 9, 2009, the Court ordered that all responses (or joinder in responses) be filed by October 13, 2009. Doc. No. 66. Oral argument on the Motions was heard on October 15, 2009. The matters are now ripe for resolution. The central issue in the cross motions is whether slot machines and the sports book equipment (along with certain communications equipment and the sports book bank) should be sold as appurtenant to the Vessel or allowed to be removed and returned to the lessors.

**Background Relevant to the Motions**

On September 28, 2009, Modern Gaming, Inc. filed an Intervening Complaint claiming a maritime lien for gaming machines on the Vessel for a total claim of $1,042,631.47. Doc. No. 44. Modern Gaming leased 169 slot machines and associated equipment and materials for operation of

---

[2]This date had been selected by agreement among the Plaintiffs who met following the September 25, 2009 status conference and submitted a proposed order with that date included.

the slot machines (collectively "the slot machines") to Las Vegas Casino Lines, LLC, for use aboard the M/V Liquid Vegas, which were on the Vessel when it was arrested by the U.S. Marshal on September 8, 2009. Doc. No. 36, Ex. A (list). Via various rental and participation agreements, Modern Gaming allowed the slot machines to be used aboard the Vessel, but they would remain the property of Modern Gaming. The owner of the Vessel, Las Vegas Casino Lines, LLC agreed to "keep the [slot machine] Equipment free and clear at all times from all claims, levies, liens, encumbrances and process." See Doc. No. 44, Exhibits A- D, Section 5(e). Each of the slot machines aboard the Vessel is marked with a label identifying the machine as "property of Modern Gaming." The value of the gaming machines aboard the M/V Liquid Vegas owned by Modern Gaming is $736,800.00. *See* Doc. No. 63, Ex. B (list of value by machine type). Modern Gaming alleges if the slot machines are allowed to be removed from the Vessel by Modern Gaming, then it will have a remaining maritime lien claim in the amount of $305,831.47. There are an additional 147 older slot machines, once used on the Vessel but now replaced with newer ones, stored in a warehouse facility at Port Canaveral. Modern Gaming does not dispute that when a vessel is arrested, all property that goes with the vessel is arrested whether aboard the vessel or ashore.

On September 23, 2009, Neptune Race and Sports Book, Inc. filed an Intervening Complaint claiming a maritime lien for sports betting equipment, certain communication equipment, and non-commingled funds for the sports book bank on the Vessel for a claim of approximately $100,000. Doc. No. 36, exhibits (listing equipment). On June 16, 2008, Neptune and Las Vegas Casino Lines, LLC entered into negotiations for a Race and Sports Lease Agreement in which Neptune was to lease to Las Vegas Casino Lines, LLC certain communication equipment and sports betting equipment. Under the terms of the prospective lease, Neptune also agreed to fund a sports book bank to be held by Vegas with non-commingled funds; the prospective lease was not signed. Doc. No. 62.

At the time the Vessel was arrested by the U.S. Marshal on September 8, 2009, Neptune contends that it was the owner of certain communication equipment and sports betting equipment aboard the Vessel, as well as monies in the sports book bank, which was not aboard the Vessel; the Neptune prospective lease stated that the sports betting and communication equipment would remain the property of Neptune, title would at all times remain in Neptune, and it would "remain in the possession and under the direct control of Neptune" even though aboard the Vessel. Las Vegas Casino Lines, LLC also granted Neptune "reasonable access" to "permit the removal of the portable parts." Doc. No. 36, Ex. 1. Las Vegas Casino Lines, LLC further agreed to "take, at its expense, all necessary measures to keep [the sports betting equipment, etc.] . . . free from any restraint, levy execution or seizure or other process of law arising from any acts or omissions of [Vegas]...which would in any way impair the title of Neptune." Doc. No. 36, Ex. 1. The communication equipment (24 televisions, brackets, satellite, and antenna) and the sports betting equipment aboard the Vessel are, Neptune alleges, easily identifiable as the property of Neptune; the funds in the sports book bank, alleged to be $15,669.26, are allegedly also easily identifiable. Doc. No. 62, Ex. 2. At the hearing on October 15, 2009, counsel could not say definitively where the monies currently are.

**Analysis**

Modern Gaming and Neptune bring their Motions for Release of Property pursuant to Local Rule 7.05(m), arguing that the slot machines and sports book and communications equipment (collectively "the gaming equipment[3]") should be released as they were not a part of the vessel, not property of the owner of the vessel, and only "incidentally" in custody. They argue (in virtually identical memoranda) that Local Rule 7.05(m) provides for separation of such property upon a

---

[3]This does not include the sports book bank, allegedly cash kept in a "cage" or safe on the Vessel and not commingled. The Court reserves ruling on the sports book bank as set forth below.

showing of entitlement to possession and payment of any fees incurred by the Marshal or custodian in maintaining or caring for the property. North Florida Shipyards and Canaveral Port Authority move to have the gaming equipment sold as appurtenant to the Vessel. Doc. No. 65, 75; *see also* Doc. No. 70 (Canaveral Port Authority's Response); Doc. No. 73 (North Florida Shipyard's Opposition to Removal). Other Intervening Plaintiffs Sysco Food Services, the Crewmembers, VNS International, Inc., and Worldwide Diesel Power, Inc., also join in the Motion to Sell the gaming equipment appurtenant to the Vessel (Doc. No. 65) and/or the responses opposing removal of it from the Vessel. Doc. No. 71, 74, 76, 77, 79. For purposes of this analysis only, the Court will refer collectively to the arguments of those maritime lien claimants who oppose removal of the gaming equipment as those of North Florida Shipyard ("NFS") since it filed the first and most thorough brief advocating finding the gaming equipment appurtenant (Doc. No. 65[4]), in which most of the other lien claimants have joined.

Modern Gaming and Neptune argue that, based on their respective agreements with the owner of the Vessel, Las Vegas Casino Lines, LLC, they should have been allowed to remove their gaming equipment from the Vessel when Las Vegas Casino Lines, LLC, as the debtor filed its Chapter 11 bankruptcy proceeding[5]. They argue that because the gaming equipment remained aboard the Vessel when the Vessel was arrested, the equipment was "incidentally" in custody and should now be ordered released. Both Modern Gaming and Neptune also contend that by releasing the gaming equipment the other lien claimants will benefit from the reduced size of the outstanding maritime claims to share in an insufficient amount of assets to pay all $4 million in claims. However, NSF

---

[4]Canaveral Port Authority's response in opposition to the Motions for release of Property Incidentally in Custody was also helpful. Doc. No. 70.

[5]According to the Movants, the Debtor Las Vegas Casino Lines, LLC filed motions to abandon Modern Gaming and Neptune's property in the bankruptcy court. Modern Gaming also filed a Motion to Lift Stay to recover its property. The bankruptcy court had not acted on these motions at the time the Vessel was arrested.

argues that removing the gaming equipment will significantly impair the condition of the Vessel and further erode the already reduced price they expect the Vessel to command at auction.

NFS contends that the gaming equipment is appurtenant to the Vessel and integral to the value of the *res* that is the sole asset of the maritime lien claimants under the Court's *in rem* jurisdiction; therefore, the gaming equipment is subject to the interlocutory sale regardless of ownership, lease agreements, location or swap arrangements. Doc. No. 65. NFS argues that "[i]t is difficult to imagine appurtenances more essential to the mission of a gambling boat than slot machines." Doc. No. 65 at 3-4.

"A maritime lien is a privileged claim upon maritime property, such as a vessel, arising out of services rendered to . . . that property. The lien attaches simultaneously with the cause of action and adheres to the maritime property even through changes of ownership until it is executed through the *in rem* legal process available or is somehow extinguished by operation of law. A maritime lien is thus a proprietary interest in a *res* that is independent of possession and is not extinguished by transfer of ownership even to a good faith purchaser." THOMAS J. SCHOENBAUM, 1 ADMIRALTY AND MARITIME LAW §9-1 (4th ed. 2004). The scope of a maritime lien includes the vessel and its apparel, fixtures, and appurtenances, even if they are leased or owned by someone other than the vessel owner. *Southwest Washington Prod. Credit Association v. O/S New San Joseph*, 1977 AMC 1123 (N.D. Cal. 1977) (holding that leased sonar equipment became appurtenant to the vessel and was thereby subject to the maritime lien). The determination of whether particular equipment on a vessel can avoid a lien is decided on a case by case basis. See 1 SCHOENBAUM § 9-1 (citing cases). Appurtenances can include the hull and engines, tackle, apparel, and furniture of all kinds. *Gonzalez v. M/V Destiny Panama*, 102 F.Supp.2d 1352 (S.D. Fla. 2000). The parties agree that the test for whether certain equipment on a vessel is an "appurtenance" subject to a maritime lien is whether a specifically

identifiable item is destined for use aboard a vessel and is essential or necessary to the vessel's "operation or mission." *See id.*

This issue has arisen previously in this District:

> The question here presented is the age old question of appurtenance, specifically, what is and is not appurtenant to a vessel. As explained more fully below, long-standing precedent teaches courts to answer this question by considering the character of the property for which a sale exemption is sought against the nature and mission of the subject vessel. If the former is necessary or beneficial to the latter, the property should remain with the vessel and be subject to the Court's *in rem* jurisdiction and the claims of traditional maritime lienors. As the Court noted long ago in *The Frolic*:
>
>> It may not be a simple matter to define what is, and what is not, an appurtenance of a ship. There are some tings that are universally so – things which must be appurtenant to every ship, qua ship, be its occupation what it may. But I think it is rather gratuitously assumed that particular things may not become so from their immediate and indispensable connection with a ship in the particular occupation to which she is destined and in which she is engaged. . . You must look to the relation they bear to the actual service of the vessel.
>
> *The Frolic*, 148 F. 921, 922 (D. R.I. 1906).
>
> Undertaking this analysis, the Court notes at the outset that *in rem* admiralty proceedings operate under the legal fiction that maritime liens may be asserted claims [against] the defendant *res – i.e.*, the vessel – rather than against the owners. Thus, the Court looks to the longstanding definition of "vessel" to determine (i) whether the vessel should or should not be sold with certain property seized at the time of the vessel's arrest or (ii) whether the vessel sale shall be subject to a claim of lien by parties asserting interest to property aboard or related to the vessel. Generally, a vessel is defined in terms of its "hull, engines, tackle, apparel, and furniture of all kinds." *See The Augusta* 15 F.2d 727, 727 (E.D. La. 1920). In short, a vessel consists of its structural equipment, apparel, and appurtenances. *See id.*
> * * *
> The concept of appurtenance, therefore, is not limited to items essential to the vessel's navigation or mechanical functioning, but includes other property supporting her mission and voyage. Further, to be appurtenant to a vessel, the item need not be attached to or installed on the vessel, nor does the item actually have to lie onboard the vessel at the time of its arrest. *See The Great Canton*, 1924 AMC 1074, 1075 (S.D.N.Y. 1924) (finding a chronometer removed prior to the sale of the vessel was appurtenant to the vessel). Though location and ownership of an item are not immaterial to the appurtenance analysis, "an item may be appurtenant to a vessel even

though the vessel and the item are not under common ownership." *Gonzalez*, 102 F. Supp.2d at 1356.

For example, it has been held that telecommunications equipment that was licensed for use to another was nonetheless appurtenant to a vessel and consequently could be used to satisfy a maritime lien. *See The Augusta* 15 F.2d at 727-28; *see also M/V Destiny*, 102 F. Supp. 2d at 1356 (holding maritime lien attaches not only to the bare vessel but also to equipment that is used aboard the vessel and is essential to the vessel's navigation, operation or mission); Turner *v. United States, 27 F.*2d 134 (S.D.N.Y. 1928) (finding a refrigeration unit not owned by the ship's owner was nonetheless a part of the ship); *Witch Queen*, 30 Fed. Cas. 396, 398 (D. Cal. 1874) (finding a diving bell and air pump, not required for the vessel's navigation, but indispensable for the object of the particular voyage she was about to enter upon – i.e., pearl diving – was subject to maritime liens for necessaries). Ultimately, the determining factor is whether the item at issue was "useful in the operation of a vessel." *See Nelson v. The Arctic,* 1956 AMC 502, 502 (W.D. Wash. 1956).

*Motor-Services Hugo Stamp, Inc. v. Regal Empress*, 8:03cv703, Doc. No. 188 at 8-10.

Modern Gaming argues that several factors weigh against the gaming equipment being an appurtenance to the Vessel, such as the intent of the parties, citing *The Mildred*, 43 F. 393 (E.D. Mich. 1890), and whether the property is marked so as to identify it as property of someone other than the vessel owner or operator, citing *United States v. M/V Golden Dawn*[6], 222 F.Supp. 186, 187 (E.D. N.Y. 1963). Modern Gaming and Neptune argue that their respective lease agreements clearly state that the property in question does not belong to Las Vegas Casino Lines, LLC, and is be returned to Modern Gaming and Neptune upon certain events, including default in payment, or bankruptcy; thus, the parties intended that the gaming was to remain the property of Modern Gaming or Neptune and was not intended to become part of the Vessel.

However, Modern Gaming concedes that "[i]t is clear from the case law that title to the property is not determinative of the right to remove the property" and "property placed aboard a

---

[6] Canaveral Port Authority argues that the *Golden Dawn* case is easily distinguished because it involved an action to foreclose a preferred ship mortgage, not involving rival claims of maritime liens for necessaries. Doc. No. 70.

vessel may be appurtenant to the vessel even if owned by third parties," but argues that the Court must also consider whether the property is easily removable and can be separated from the vessel without impact to the operation of the vessel and without significant damage to the vessel. Neptune also argues that the sports book and televisions can also be removed without damage to the Vessel; the sports book bank is in non-commingled cash and may not even be on the Vessel.

The Court finds that the determination of an appurtenance turns on the issue of whether the gaming equipment is "essential" or "necessary for the mission" for the Vessel as a casino vessel. Modern Gaming and Neptune argue that the gaming equipment is not necessary or essential to the mission, and NFS argues the gaming equipment is essential and necessary. Modern Gaming argues that the slot machines are not necessary for the mission of the Vessel as a casino vessel in that Las Vegas Casino Lines, LLC continues to own the old slot machines which are currently in storage at Port Canaveral and the old slot machines can be placed aboard the vessel in the place of the newer slot machines; plus, the newer slot machines can be removed without damage to the vessel by unbolting the equipment, the vessel will be fully equipped when sold by the U.S. Marshal.

The Court finds persuasive the reasoning of Judge Scriven in addressing the appurtenance issue in *Motor Services Hugo Stamp, Inc. v. M/V Regal Empress*, Case No.: 8:03-cv-703MSS (Doc. No. 188), which involved a "luxury entertainment cruise ship" that offered gambling as a choice of entertainment:

> [None of the claimants] offer any reasoned basis for the entry of an order compelling the pre-sale return of their gambling, casino or security equipment. The essential argument advanced by these claimants is that their devices should be excepted from the interlocutory sale because the claimants, on acquiescence of the ship's owners, contractually agreed that the property would be so exempt. If that were the test, then surely all providers of equipment and supplies for the benefit of a vessel's voyage could avoid forfeiture of their interest by merely tagging their property until their claims of line had been fully satisfied. Thus, on stipulation of the vessel's owners, Plaintiff Motor-Services would have affixed similar indicia of its exclusive ownership on the engines it repaired, thereby declaring those engines exempt from all maritime

> liens until such time as the repair price was fully paid. Because an *in rem* proceeding brought under maritime law operates under the fiction that claims are pursued against the vessel rather than her owners, the agreement of the owners as to what constitutes an appurtenance is hardly relevant and clearly not dispositive.
>
> While the parties alternatively rely on Local Rule 7.05(m), M.D. Fla., as the basis for the relief sought, that rule facially has no application here. Local Rule 7.05(m) was promulgated apparently to deal primarily with laden cargo, which the commentators acknowledge is not an issue that arises with any frequency and not an issue addressed in any "oft-cited cases" in maritime jurisprudence. *See* M.D. Fla. Local Rule 7.05(m), advisory committee's notes. Though the rule states expressly that it is not limited to laden property, it nonetheless is expressly limited to "incidental property" taken into custody at the time of the arrest. This of course begs the questions, what property is merely incidental to arrest and what property is central to the arrest. Of course the vessel is the property central to the arrest, which brings the issue full circle to the question of appurtenance.
>
> Thus, again the outcome-determinative issue is whether these recreational gambling facilities . . . were necessary to the navigation, operation and mission of the vessel. As set forth extensively *supra*, this Court finds that the M/V Regal Empress; mission was to serve as a recreational, luxury cruise liner, providing recreational service to her passengers. While the M/V Regal Empress is not first and foremost a gambling cruise ship, gambling is a choice of entertainment provided. Looking then to the "relations [these services] bear to the actual services of the vessel," the Court finds they are appurtenant to the vessel and subject to maritime liens. *See The Frolic*, 148 F. at 922.

*M/V Regal Empress*, Case No. 8:03-cv-703, Doc. No. 188 at 15-16.

In this case, the argument is even stronger than in *Regal Empress* that gaming equipment is necessary to the Vessel's operation and mission as a floating casino. Judge Scriven's analysis applies to this case and contradicts several of Modern Gaming and Neptune's arguments that the gaming equipment should be released because the ship's owners contractually agreed that the property would be so exempt. "If that were the test, then surely all providers of equipment and supplies for the benefit of a vessel's voyage could avoid forfeiture of their interest by merely tagging their property until their claims of line had been fully satisfied." Her illustration is on point: if ownership were the test, those providing necessaries would "affix[] similar indicia of its exclusive ownership" on whatever necessaries they provided, "thereby declaring those [necessaries] exempt from all maritime liens until

-11-

such time as the repair price was fully paid"; thus, agreement of the owners as to what constitutes an appurtenance is "hardly relevant and clearly not dispositive."

Judge Scriven also rejected the parties' reliance on Local Rule 7.05(m) which was promulgated to deal primarily with infrequent issue of laden cargo. In a footnote, Judge Scriven explained that "it appears that the rule was intended to address personal belongings such as items left aboard a vessel, packages being delivered and laden cargo. *M/V Regal Empress*, Case No. 8:03-cv-703, Doc. No. 188 at 16 n. 7. The M/V Regal empress was "not first and foremost" a gambling cruise ship, but gambling was a choice of entertainment provided. This facts of this case are even stronger for finding that the gaming equipment installed on the Vessel and stored in the Port Canaveral warehouse as "necessary to the navigation, operation and mission" of the M/V Liquid Vegas, which is a as gambling vessel.

The existence of other, older slot machines which could be substituted for those supplied by Modern Gaming is of no moment. Virtually any item used on or part of a vessel could be replaced if removed. This does not change its underlying characterization as an appurtenance. Ready access to replacements does not make the installed slot machines any less essential to the "mission" of the vessel.

### *CONCLUSION*

Accordingly, Neptune Race and Sports Book, Inc.'s Motion for Release of Property Incidentally in Custody (Doc. No. 62) is **DENIED** in part and **RESERVED** in part. Modern Gaming, Inc.'s Motion for Release of Property Incidentally in Custody (Doc. No. 63) is **DENIED**. North Florida Shipyard's Motion to Sell Slot Machines Appurtenant to the Vessel (Doc. No. 65) is **GRANTED**. Canaveral Port Authority's Motion to Sell and Joinder in Doc. No. 65 (Doc. No. 75) is **GRANTED**. As discussed at the hearing, the Court will reserve ruling on the sports book "bank" – allegedly held in cash that was not commingled – until further documentation is filed by the parties.

**DONE** and **ORDERED** in Orlando, Florida on October 15, 2009.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties